UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DR. MICHAEL B. MORGAN, | Case No. 2:20-CV-00430 (MEF) (SDA) |
| Plaintiff, | **OPINION** |
| v. | September 30, 2025 |
| QUEST DIAGNOSTICS INCORPORATED, | |
| Defendant. | |

**STACEY D. ADAMS, United States Magistrate Judge**

This matter is before the Court on the Motion of Plaintiff Dr. Michael B. Morgan ("Plaintiff") seeking sanctions against Defendant Quest Diagnostics Incorporated ("Defendant"). (ECF No. 297). Defendant filed an opposition (ECF No. 301) and Plaintiff filed a reply (ECF No. 302).[1] The motion was referred to the undersigned for resolution. (ECF No. 297). The Court heard oral argument on March 3, 2025.[2] For the reasons set forth herein, Plaintiff's Motion for Sanctions, and all relief requested therein, is **DENIED**.

**RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

In this action, Plaintiff alleges breach of contract and unjust enrichment stemming from the termination of his employment with Defendant on or about January 28, 2015. (Second Am. Compl., ECF Nos. 77 (redacted version), 78 (complete version filed under seal)). Plaintiff is a board-certified pathologist and dermatopathologist. (*Id.* ¶ 1). He started working at Dermpath

---

[1] Defendant attempted to file a Sur-Reply (ECF No. 304-1), but the Court denied this request on January 13, 2025 and did not consider the filing. (ECF No. 306).

[2] Following oral argument, Plaintiff attempted to submit a supplemental brief. (ECF No. 309). The Court denied this request and did not consider the filing. (ECF No. 312).

1

Diagnostics in 1996, in its Tampa laboratory. (*Id.* ¶ 8). Quest acquired Dermpath in 2007. (*Id.* ¶ 10). In 2008, Plaintiff became the managing director of Defendant's Tampa laboratory. (*Id.* ¶ 9). Plaintiff and Defendant subsequently entered into a five-year employment agreement covering the time period of November 1, 2012 through February 1, 2017. (*Id.*, Exh. A). The Agreement permitted Defendant to terminate Plaintiff's employment for cause at any time upon written notice for 22 separate reasons. (*Id.,* Exh. A, ¶ 14(a)). It also permitted Plaintiff to terminate his employment upon 120 days written notice. (*Id.,* Exh. A, ¶ 14(b)). Finally, the Agreement provided that Defendant could terminate Plaintiff's employment without cause at any time, which triggered a severance payment to Plaintiff. (*Id.,* Exh. A, ¶ 14(c)).

In January 2015, Defendant commenced an investigation over concerns that Plaintiff had fabricated the test results of patient, V.H. (PASMF, ECF No. 275).[3] Specifically, Plaintiff issued a report on January 7, 2015 pertaining to a skin specimen taken from V.H. on December 11, 2014. (PASMF ¶ 85; Marquez Decl., Exh. 16). However, Quest had no record of receiving V.H.'s sample

---

[3] Prior to the filing of the instant motion, Defendant filed a motion for summary judgment (ECF No. 261), which was fully briefed and then administratively terminated pending the outcome of this sanctions motion. (ECF No. 300). Because of the interrelationship between the two motions, both parties rely heavily on their respective statements of material fact and supporting declarations with exhibits in connection with this sanctions motion. Accordingly, the Court has reviewed these documents and will refer to them as follows:
- Defendant's 07/24/24 Statement of Undisputed Material Facts submitted in support of its motion for summary judgment (ECF No. 261-2) will be referred to as "DSUMF."
- The 07/24/24 Declaration of Ronald T. Coleman, Jr. Esq. submitted in support of Defendant's motion for summary judgment (ECF No. 262) will be referred to as the "Coleman 07/24/24 Decl."
- Plaintiff's 09/04/25 Additional Statements of Materially Disputed Facts (ECF No. 275) will be referred to as "PASMF."
- The 09/04/24 Declaration of Jorge Marquez submitted in opposition to the motion for summary judgment (ECF No. 274) will be referred to as the "Marquez Decl."
- The 10/07/24 Declaration of Ronald T. Coleman submitted in support of Defendant's reply to the motion for summary judgment (ECF No. 289) will be referred to as the "Coleman 10/07/24 Decl."

2

from Dr. Michelle Foley of the Parks Dermatology Center ("Parks"). (PASMF ¶¶ 45-47; DSUMF ¶ 8).

According to Plaintiff, Dr. Foley's office had commingled patient samples in the past. (PASMF ¶ 370). Therefore, when the facility learned on December 30, 2014 that three samples from Parks were missing, Plaintiff decided to check other samples taken by Dr. Foley on the same date. (PASMF ¶¶ 54, 62-70). Plaintiff claims that, on January 7, 2015, he discovered that V.H.'s sample had indeed been commingled with the sample from another Parks patient, G.D., which was designated with Accession No. BD-14. (PASMF ¶¶ 44, 66, 70-77). Plaintiff states he then instructed a laboratory supervisor, Caya Kalua-Markel, to separate the two tissue samples. (PASMF ¶ 78). He contends that Kalua-Markel removed V.H.'s tissue sample, placed it on a separate slide, and then brought it to Plaintiff to review. (ECF No. 298 at 5-6). Plaintiff claims he reviewed the new slide and issued a report and diagnosis for V.H. on January 7, 2015, which was assigned Accession No. BD-15. (PASMF ¶ 85; Marquez Decl., Exh. 16).

Shortly thereafter, Defendant commenced a second investigation, concerned that Plaintiff rendered his January 7, 2015 report for V.H. without a separate block and slide, from the sample of another patient, G.D. (PASMF ¶ 112). In connection with this investigation, Plaintiff claims that on January 13, 2015, Luis Soto, the Laboratory Operations Director, moved the tissue from BD-14 block and slide to another block and slide that he then designated with the same accession number previously assigned to V.H., BD-15. (PASMF ¶¶ 166-67). In doing so, Plaintiff argues, Soto destroyed the original BD-15 block and slide created by Kalua-Markel on January 7, 2015. (PASMF ¶ 187). This, Plaintiff claims, constitutes impermissible spoliation of evidence warranting sanctions. (ECF No. 298 at 4).

3

Defendant has a different version of events. According to Defendant, Plaintiff opened a case for V.H., assigned it Accession No. BD-15, and then rendered a report for V.H. based upon the BD-14 slide. (DSUMF ¶ 10; Marquez Decl., Exh. 13 at 111). Soto became concerned that Plaintiff had opened an accession number and issued a pathology report for V.H. based only on a single slide that was already accessioned to a different patient case, BD-14. (Coleman 07/24/24 Decl., Exh. O). When Soto showed the BD-14 slide to other dermatopathologists, they did not see two different tissue samples. (*Id.*). Soto elevated his concerns and there was a telephone conference on January 13, 2015 with Plaintiff, Soto, Damon Ball (Soto's supervisor) and Dr. Edward Kramer (VP of Dermatopathology). (Coleman 07/24/24 Decl., Exh. A at 212; Exh. O at 271-73).[4] Based upon Plaintiff's claim that he had discovered a second tissue specimen belonging to V.H. on BD-14, Plaintiff and others at the meeting directed the alleged two specimens on the BD-14 slide to be separated so that a separate and unique block and slide could be assigned to the V.H. specimen and associated with the new BD-15 case that Plaintiff had opened at the time he prepared the January 7, 2015 report. (Coleman 07/24/24 Decl., Exh. O at 271-73). The new slide and block were created on January 13, 2025 and assigned Accession No. BD-15. (*Id.* at 270-74). Soto did not personally create the BD-15 block and slide; they were done by someone qualified to do so in the laboratory. (Baroody Decl. (ECF No. 301-1), Exh. 3, ¶ 7).

The Florida Department of Health thereafter commenced an investigation into the incident. Plaintiff's counsel submitted a response to the Administrative Complaint on Plaintiff's behalf on July 25, 2015, which was signed by Plaintiff. (Coleman 10/07/24 Decl., Exh. R at 11). Defendant contends that, in that document, Plaintiff admitted the slides were not separated until after January 7, 2015: "[a]pproximately two weeks later, on or about 16 January 2015, the incident was

---

[4] Damon Ball is occasionally identified incorrectly in the papers as Damon Bause.

discussed… [and] [i]t was agreed that the two specimens would be separated and a separate diagnosis for each would be formalized." (*Id.* at 13).

Therein lies the heart of the dispute. Plaintiff claims the BD-15 block and slide were created on January 7, 2015 at the time he rendered the V.H. report. Defendant claims that Plaintiff issued his January 7, 2015 report based solely upon the missing specimen he purportedly found on BD-14, and that no block or slide was created for BD-15 until January 13, 2015, after Defendant opened its investigation. Plaintiff alleges that Defendant (acting at Soto's direction) destroyed the original BD-15 slide that would have exonerated him by re-embedding it on January 13, 2015. Defendant argues there never was any BD-15 slide to destroy.

Plaintiff was placed on an administrative leave on January 21, 2015, while the investigation was pending. (PASMF ¶ 282). Plaintiff claims he was escorted off the premises by two security officers, advised to take his personal belongings with him, and never permitted to return again. (*Id.* ¶ 282; ECF No. 298 at 1). This, Plaintiff argues, was tantamount to him being fired by Defendant. (*Id.*). Despite this, it is undisputed that Plaintiff sent two written communications resigning from his employment on January 27, 2015 and again January 28, 2015. (DSUMF ¶¶ 2, 21; Coleman 07/24/24 Decl., Exhs. D, E, J, K. H, I). Defendant simultaneously issued Plaintiff a notice of termination for cause on January 27, 2015, but it was not received by Plaintiff before he tendered his resignation. (Coleman 07/24/24 Decl., Exh. A at 249-250). Plaintiff thus resigned before Defendant communicated its employment decision to Plaintiff. (DSUMF ¶ 21),

Notably, the physical blocks and slides for BD-14 and BD-15 were maintained by Defendant, provided to counsel after this lawsuit was filed, and made available to Plaintiff for inspection during discovery. (ECF No. 301 at 12). Plaintiff concedes that neither he nor his expert reviewed them. (ECF No. 301 at 12; ECF No. 302 at 3-4). Instead, Plaintiff counters that reviewing

5

the currently existing block and slide for BD-15 would be fruitless, because they were altered on January 13, 2015 and, therefore, the contents of the original BD-15 created on January 7, 2015 no longer exist. (ECF No. 302 at 3-4).

Plaintiff argues that the alleged destruction of the original BD-15 on January 13, 2015 – five years before he filed the instant litigation – constituted spoliation of evidence and warrants sanctions and an adverse inference against Defendant.

## **LEGAL STANDARD**

Spoliation of evidence "includes both the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Neal v. Powell*, No. 17-CV-4768 (KMW) (MJS), 2024 WL 3466800, at *3 (D.N.J. July 19, 2024) (citations and internal quotation marks omitted). "The Court's authority to impose sanctions for spoliation stems from both the Federal Rules of Civil Procedure and the Court's inherent authority to sanction litigants for misconduct." *Id.* (citations omitted); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (noting a court's inherent power to impose sanctions for misconduct before it). The decision to impose sanctions is a matter committed to the Court's sound discretion. *See Dirauf v. Berger*, 506 F. Supp. 3d 254, 269 (D.N.J. 2020), *aff'd*, 57 F.4th 101 (3d Cir. 2022).

Where, as here, the allegedly spoliated evidence is non-electronic, the Court applies the test set forth in *Bull v. United Parcel Service, Inc.*, 665 F.3d 68, 73 (3d Cir. 2012). Pursuant to *Bull*:

> Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party.

6

*Id.* These are elements, not factors. *Masterank Wax, Inc. v. RFC Container, LLC*, No. 19-CV-12245 (KMW) (MJS), 2022 WL 19927891, at *4 (D.N.J. Aug. 30, 2022). Accordingly, the Court must find each part of the test satisfied before it can consider whether and what sanctions are appropriate. *See Bull*, 665 F.3d at 73 n.5 (emphasizing distinction between sanctions and spoliations analyses); *Neal v. Powell*, No. 17-CV-4768 (KMW) (MJS), 2024 WL 3466800, at *3 (D.N.J. July 19, 2024) (noting *Bull* articulated a two-step analysis for determining spoliation sanctions).

Plaintiff, as the party seeking a spoliation sanction, has the burden of establishing each element. *See McCann v. Kennedy Univ. Hosp., Inc.*, No. 12-1535 (JBS) (JS), 2014 WL 282693, at *4 (D.N.J. Jan. 24, 2014). "It is Plaintiff's burden to establish facts from which the Court could at least infer that the evidence existed in the first place; not Defendant's burden to show that the evidence did not exist." *Omogbehin v. LaHood*, No. 06-CV-4581 (JEI) (JS), 2010 WL 11570149, at *2 (D.N.J. June 28, 2010) *aff'd sub nom. Omogbehin v. Cino*, 485 F. App'x 606 (3d Cir. 2012).

## ANALYSIS

### I. Plaintiff Failed to Prove that the BD-15 Block and Slide Existed on January 7, 2015

Before this Court can reach the issue of spoliation, it must first determine whether a BD-15 block and slide existed as of January 7, 2015 that was subsequently altered by Defendant. There can be no finding of bad faith if the evidence alleged to have been altered or lost never existed in the first place. *Castellani v. City of Altantic City*, No. 13-cv-5848 (JBS)(AMD), 2016 WL 7155826, at *4 (D.N.J. Sept. 15, 2026). It is the movant's burden to show that the evidence he contends was spoliated in fact existed. *Omogbehin*, 2010 WL 11570149, at *2; *see also Jacobsen v. California*, No. 14-CV-00108 (JLT) (PC), 2017 WL 2654749, at *2 (E.D. Cal. June 20, 2017) (holding that "[b]efore the elements of a spoliation claim can be evaluated, it is fundamental that

7

a party seeking sanctions establish that the evidence in question actually exists in an altered form, or previously existed"); *Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 202 (S.D.N.Y. 2014) (providing that the "spoliation doctrine is predicated on evidence *actually existing* and being destroyed" (emphasis added)).

Plaintiff acknowledges that there is no direct evidence to establish that the BD-15 slide and block were created on January 7, 2015. (ECF. No. 313 at 12-13) ("there is no document that shows this [BD-15] block and slide were created exactly at this moment… however, circumstantially, that's the way it's interpreted). Plaintiff therefore primarily relies on three pieces of evidence in support of this contention: (i) the deposition testimony of Kalua-Markel; (ii) his own deposition testimony; and (iii) two emails sent on January 7, 2015 and January 8, 2015. (ECF No. 298 at 3-4). As explained below, none of these provide convincing evidence that the BD-15 slide actually existed as of January 7, 2015.

Turning first to the deposition of Kalua-Markel, it is confusing, contradictory, and does not conclusively establish when the new block and slide were created. Contrary to Plaintiff's assertion that a new block and slide were created on January 7, 2015, Kalua-Markel testified that the "small fragment of tissue" found in BD-14 that "did not belong" was too small to survive and could not be saved:

> Q. Do you recall that you created two blocks after Dr. Morgan directed you to do this? Or were you only able to save the tissue in one block?
>
> Mr. Marquez: Object to the form. You can answer
>
> A. I was only – yeah, *I was only able to save the one*. The other one was just too small. It – it did not survive. It was very tiny. So I was *only able to make the one*, but I did bring back all that I had to him [Plaintiff].

(Marquez Decl., Exh. 14 at 33-37) (emphasis added).

8

Kalua-Markel went on to testify that the original block and slide, BD-14, remained "unaltered" and that the new block containing the tiny fragment "did not survive":

> Q. And so when you moved – removed the – what he described as a separate piece of tissue from the slide and the block [BD-14], did the original block with the original tissue remain intact?
>
> A. So when he asked me to take the smaller fragment of tissue out of the block, it went into a separate block. The original slide that had the first piece of tissue plus the tiny piece of tissue remained as it was. *That was unaltered.* Okay?
>
> So now we have the original slide with the fragment and the bigger piece of tissue. We have the first block with the original piece of tissue and the second block with the tiny fragment *that did not survive.* Now, when the tissues got separated, a slide was made from each block from those as well.

(*Id.*) (emphasis added).

Then, despite the above testimony, Kalua-Markel contradicts herself:

> Q. So after you did what Dr. Morgan directed you to do, what was – the slides and blocks that remained was the original slide with both pieces of tissue on it, correct?
>
> A. Yes.
>
> Q. A new slide with the new piece of tissue that he said was separate, correct?
>
> A. Yes. And –
>
> Q. Was there a – was there a third slide with only the original piece of tissue?
>
> A. Yes.
>
> Q. And then there was the block – for the blocks, there was only the original block because there could – or where there two blocks, one with the removed piece of tissue?
>
> A. There were two –

> Mr. Marquez: Objection. Form. You can answer
>
> A. There were two – two blocks, but the smallest fragment was very hard to find in the block. I mean, maybe they saw it microscopically, but it was very small. But, yes, those – so the original slide, the two new slides, and the two blocks.

(*Id*).

Importantly, Kalua-Markel never mentions the date all this was done (and Defendant suggests she might be confused and that her testimony actually refers to what happened on January 13, 2025). Nor does Kalua-Markel testify that she assigned the new block and slide with Accession No. BD-15.

Kalua-Markel's testimony thus leaves Plaintiff with several problems. First, if the tiny fragment did not survive once removed from BD-14, then it defies logic that a new block and slide would be created. Second, even if Kalua-Markel created a new block after separating the fragment, by her own testimony, the fragment did not survive. Therefore, there would be nothing on BD-15 for Plaintiff to examine and render his report for V.H. Third, the original BD-14, which Plaintiff claims contained both samples, *remains unaltered* to this day. Defendant offered to produce BD-14 for inspection during discovery. A review of this slide would have easily confirmed whether it contained two specimens. Yet, Plaintiff chose not to review the slide.

Second, the self-serving deposition testimony upon which Plaintiff relies is directly contradicted by his statement to the Florida Department of Health on July 25, 2015 – made far closer in time to the actual event than any deposition testimony offered in this case. Plaintiff's statement indicates that he, Soto, Dr. Kramer, and Damon Ball agreed during a call on January 16,

10

2015[5] that "the two specimens would be separated and a separate diagnosis for each would be formalized." (Coleman 10/07/24 Decl., Exh. R, at 11). Obviously, if the specimens had already been separated on January 7, 2015 then there would be no need for this instruction. Further, if Plaintiff had directed Kalua-Markel to create a new block and slide at the time he issued his report on January 7, 2015, he presumably would have mentioned this critical detail in his statement to the Florida Department of Health. Instead, Plaintiff stated that he circled/stenciled the smaller specimen on the original slide "to aid in the physical discrimination of the two specimens for *planned* tissue extraction and second block creation." (*Id.* at 10) (emphasis added). He further admitted that:

> The proper biopsy report belonging to Patient [V.H.] was developed, completed and sent to Dr. Foley. The slide, block and requisition form were placed on the desk of the Lab Director, Luis Soto, personally by Dr. Morgan, for a full investigation and determination as to the multiple sources of error, *and a later re-issuing of separate blocks* and amended reporting of the case originally diagnosed….

(*Id.* at 11) (emphasis added).

These statements demonstrate that Plaintiff did not separate the specimens at the time he issued his report on January 7, 2015 but, rather, "planned" to do so at a "later" date only after Defendant commenced an investigation.

Plaintiff attempts to deflect the admissions made in this document by claiming his attorney was "confused." (ECF No. 313, Tr. at 69). However, Plaintiff, a highly educated medical professional, reviewed and signed the statement. (Coleman 10/07/24 Decl., Exh. R at 16).

---

[5] In his Reply brief, Plaintiff makes much of the fact that his statement referenced January 16, 2015, rather than January 13, 2015. The Court suspects this was a typographical error, but the exact date is of no moment. The import of this statement is Plaintiff's admission that the two specimens were separated sometime after January 7, 2015 and that Plaintiff agreed with this course of action. (*Id.*).

11

Plaintiff also denies that he and the others directed Soto to separate the two slides on January 13, 2015. His arguments in this regard are unpersuasive. The deposition testimony Plaintiff cites contains a vague statement that there was no take-away or action item or any-follow-up that was going to occur after the call. (PASMF ¶ 178: Marquez Decl., Exh. 13 at 157-158). It does not specifically address whether Soto was instructed to separate the specimens. (*Id.*). The testimony does, however, acknowledge that Soto would be conducting an internal investigation, which – consistent with Plaintiff's statement to the Florida Department of Health – would have included separating the specimens and rendering a separate diagnosis for each. (*Id.*). In any event, Plaintiff's self-serving deposition testimony taken on January 26, 2023, 8 years after the incident, is far less convincing than his much more contemporaneous accounting of events made to the Florida Department of Health on July 25, 2015. (ECF No. 289-2).

Plaintiff also misleadingly claims that Ball denied directing Soto to separate the samples during the call on January 13, 2015. (ECF No. 302 at 2; PASMF ¶ 179). However, the testimony Plaintiff cited asked Ball whether he instructed Soto to "*reinvent* the block on or around January 13, 2015." (Marquez Exh. 15, at 72-73). Not surprisingly, Ball answered "I certainly don't recall that" and "I cannot imagine that I would ask anybody to reinvent a block at that stage, given these circumstances." (*Id.* at 73). Ball was not asked whether he directed Soto to separate the two specimens on BD-14; he was asked whether he instructed Soto to "reinvent" an existing block. Ball's testimony therefore supports Defendant's contention that there was no existing BD-15 block to "reinvent."

Finally, Plaintiff relies on two separate emails he feels confirm that BD-15 was created as early as January 7, 2015. (ECF No. 298 at 3-4). The first is an email from Jennifer Rinier to Karyn Carroll dated January 7, 2015 that states "[t]he tissue was found on the slide for [BD-14] (patient

12

[redacted]). We have created a new *case* for [redacted] which is [BD-15]." (ECF No. 274-9 at 13) (emphasis added). This language does not establish that a new block and slide were created for BD-15. Rather, it establishes that a new *case* was created for V.H. based on a single slide (BD-14) assigned to another patient. (*Id.*) This was Defendant's precise concern, and what triggered the investigation. Similarly, there was a second email from Rinier to Soto dated January 8, 2015 in which she stated "During Dr. Morgan's review of the slides from 12/11/14, he located the tissue on another slide. The slide belonged to [BD-14]. At that point, we created a new accession…under [BD-15]." (*Id.* at 11). Again, this email does not establish that a new slide and block were created on January 7, 2015. Rather, it establishes that Plaintiff directed a report with a new accession number based upon what he reviewed on a single slide, BD-14. At best, these emails establish that a new case was created on January 7, 2015; they do not substantiate the creation of a new block and slide on this date.

The burden is on Plaintiff to show that the BD-15 block and slide actually existed on January 7, 2015, and was later altered by Defendant. The evidence presented by Plaintiff falls far short of this burden. If the slide and block did not exist on January 7, 2015, then there is no basis for Plaintiff's spoliation claim.

## II. Even if Plaintiff Established that the BD-15 Block and Slide Existed on January 7, 2015, He Failed to Establish Spoliation

Even if Plaintiff could demonstrate that the BD-15 block and slide existed on January 7, 2015, he fails to establish a claim of spoliation under *Bull*. *See* 665 F.3d at 73. The first two *Bull* elements are easily satisfied here. Namely, it is undisputed that the BD-14 and BD-15 blocks and slides have been in Defendant's exclusive control. It is also beyond question that these blocks and slides are relevant to the claims and defenses in this action. The Court therefore focuses on the third and fourth elements.

13

1. *Actual Suppression or Withholding of Evidence*

This element requires the Court to assess whether Defendant acted in bad faith to suppress the original BD-15. Suppression requires a showing of bad faith; it is not enough that the evidence was altered or destroyed. *See Bull,* 665 F.3d at 79 (holding that "a finding of bad faith is pivotal to a spoliation determination" because "[w]ithholding requires intent"); *Flint Grp. Packaging Inks N. Am. Corp. v. Fox Indus. Inc.*, No. 16-3009 (CCC) (MAH), 2023 WL 4633925, at *7 (D.N.J. June 29, 2023) (holding that "[t]he actual suppression standard requires a showing of intent apart from establishing the alleged conduct as a matter of fact" (internal quotation marks and citation omitted)); *Peterson v. Attorney General of Pa.*, 551 F. App'x 626, 628 (3d Cir. 2014) ("[w]hile [plaintiff] has demonstrated to our satisfaction that the relevant evidence was not produced, she did not come close to showing the bad faith necessary to support a claim for spoliation"); *Castellani*, 2016 WL 7155826, at *4 (holding "[t]he touchstone of the *Bull* test appears to this Court to be a finding of bad faith" (internal quotation marks and citations omitted)). It follows that, spoliation requires intent and therefore "destruction that occurs as a result of inadvertence, routine practice, or accident is not spoliation at all." *Neal*, 2024 WL 3466800, at *6 (internal quotation marks and citation omitted); *see Bull*, 665 F.3d at 79.

As an initial matter, no evidence was withheld or suppressed. Plaintiff concedes that the BD-14 and BD-15 blocks and slides still exist, and that Defendant made them available to Plaintiff for inspection during discovery. Plaintiff declined to do so, contending that such an examination would be fruitless because the existing BD-15 is not the slide that was created on January 7, 2015, and all that remained was Soto's altered version. (ECF No. 302 at 2). How does Plaintiff know this if he never examined BD-15? Further, Kalua-Markel testified that the tiny sample placed on the BD-15 block did not survive. (Marquez Decl., Exh. 14, at 33-37). If there was no second sample

14

on the BD-15 block, then nothing was suppressed. Lastly, according to the testimony of Kalua-Markel, BD-14 was "unaltered" meaning it should still contain V.H.'s tissue if, as Plaintiff contends, the secondary tissue was indeed commingled on the original slide. (Marquez Decl., Exh. 14 at 33-37). This potentially critical evidence was not suppressed; Plaintiff choose not to review it. Despite the lack of inspection, Plaintiff summarily asserts spoliation of the BD-15 slide and block.

More importantly, there is no evidence that Soto acted in bad faith when he followed the instructions of his supervisor, Plaintiff, and Dr. Kramer to separate the two specimens. Even if the BD-15 slide was, in fact, altered on January 13, 2015, such actions were taken only 6 days after the original was created, as part of an ongoing investigation, prior to the termination of Plaintiff's employment and more than five years prior to the filing of this litigation. Under these circumstances, Plaintiff cannot establish that any alteration was done in bad faith to purposely destroy evidence and prevent its use in this litigation.

Plaintiff's arguments that Defendant lacked adequate preservation policies and chain of custody protocol, and that Defendant conducted an inadequate investigation, do not support a finding of spoliation. These arguments go to the merit of Plaintiff's claims and, more specifically, whether he engaged in conduct that justified a termination with cause. They do not establish intent. At best, Plaintiff has created a disputed issue of fact as to whether Defendant acted with the requisite bad faith to support a spoliation claim. This does not satisfy his burden for establishing spoliation, and is best left to trial. *See Castellani*, 2016 WL 7155826, at *4 (denying motion for spoliation sanctions where there was a factual dispute as to whether the document at issue ever existed, and thus the Court could not determine whether there was any bad faith involved in the document's destruction or non-production, thereby leaving a determination for a trial where the

court could consider the precise nature of the proof offered and the credibility of the witnesses); *see also Frazier v. Bed Bath & Beyond Inc.*, No. 10-CV-5398 (WJM), 2013 WL 1845499, at *7 (D.N.J. Apr. 30, 2013) (declining to issue spoliation sanctions where "the charge rest[ed] on disputed facts"); *Williams v. Klem*, No. 07-CV-1044 (MCC), 2010 WL 3812350, at *3 (M.D. Pa. Sept. 22, 2010) (concluding that "evidentiary rulings on whether, and to what extent, a spoliation inference [was] warranted, should await trial" where the parties "present[ed] countervailing factual accounts which [could not] be readily reconciled"). In sum, Plaintiff's motion fails to establish the requisite bad faith suppression required to establish spoliation.

### 2. *Was the Duty To Preserve Reasonably Foreseeable*

The fourth element of the *Bull* test requires Plaintiff to establish Defendant had a duty to preserve the BD-15 slide as of January 13, 2015, when it was allegedly altered. "Absent a duty to preserve, there can be no spoliation." *Flint Grp.*, 2023 WL 4633925, at *6. There cannot be spoliation where evidence is lost or destroyed before a duty to preserve arose. *See Bistrian v. Levi*, 448 F. Supp. 3d 454, 467-68 (D.N.J. 2024). For the purposes of spoliation, the common-law "duty to preserve" applies. This means the duty to preserve relevant information begins only when litigation is reasonably foreseeable. *Id.* (quoting Fed. R. Civ. P. 37(e) Advisory Notes).

A party "is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation." *Mosaid Techs. Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332, 336 (D.N.J. 2004). This common-law standard is an objective one, asking not whether a party anticipated litigation, but "whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011). The "reasonably foreseeable" test "is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad

16

factual situations inherent in the spoliation inquiry." *Bull*, 665 F.3d at 78 (quoting *Micron Tech.*, 645 F.3d at 1320). The duty to preserve can arise before a complaint is filed, depending on the circumstances. *Bistrian*, 448 F. Supp. 3d at 468. It requires something more than the "distant possibility" of litigation, but does not require that litigation be "imminent, or probable without significant contingencies." *Micron Tech.*, 645 F.3d at 1320.

Here, Plaintiff alleges that Defendant spoliated evidence on January 13, 2015. Plaintiff thus asks this Court to assume that Defendant knew this situation would end up in litigation a mere six days after he claims the original slide was created and more than five years before this litigation was actually filed. This assertion is belied by the evidence. First, Plaintiff acknowledged, during his deposition testimony, that his January 13, 2015 meeting with Soto, Ball, and Dr. Kramer regarding V.H.'s diagnosis was:

> collegial and they accepted what I said. There was no indication at that point, at least in my mind, looking back, and it's been some tine, that they had any, you know, lingering concerns or that this would initiate a larger issue.

(Marquez Decl., Exh. 13, Morgan Dep. at 157). If Plaintiff himself did not suspect there were any issues as of January 13, 2015, then Defendant could not possibly foresee litigation on the date of the alleged alteration.

Second, the alleged alteration on January 13, 2015 occurred well before Plaintiff resigned from his position on January 27, 2015 and before Defendant made the decision to terminate him for cause on that same date. It is stretch to suggest that Defendant reasonably anticipated litigation more than two weeks prior to Plaintiff's separation date, and before its investigation into Plaintiff's conduct had even been completed.

Third, more than five years passed between Plaintiff's separation and the institution of this lawsuit. The fact that Plaintiff waited so long to sue undermines any argument that Defendant

17

should have reasonably anticipated litigation a mere six days after the BD-15 block and slide were allegedly created. As Defendant's legal counsel, Kenneth Johnson, Esq., testified, internal laboratory investigations were conducted all the time, some lasting minutes and some lasting weeks. (ECF No. 274-4 at 104:1-15). There is no indication that Defendant knew at the start of this particular investigation that the outcome might lead to litigation. The duty to preserve is not triggered merely due to the beginning of an investigation. *Flint Grp.*, 2023 WL 4633925, at *7-8 (holding that the duty to preserve was not triggered when the investigation began but, rather, when the investigation concluded and the faulty component was revealed); *see also Scott v. IBM Corp.*, 196 F.R.D. 233, 249 (D.N.J. 2000) (duty to preserve arose after employees were fired as part of a reduction in force). Here, Plaintiff claims Soto directed the creation of BD-15 on January 13, 2015, after a "collegial" meeting, at the beginning of his investigation, when he was trying to ascertain what occurred. Soto certainly had no idea at that point it would lead to Plaintiff's termination.

The investigatory oversight by Defendant's internal legal counsel does not change this outcome. The Investigation Report conclusively indicates Johnson was not contacted until January 14, 2015, after the "new" BD-15 slide and block were created and a review of those slides indicated no presence of a second tissue specimen. (Coleman 07/24/24 Decl., Exh. M). This is consistent with Johnson's deposition testimony, wherein he indicated the date he was informed of the alleged misconduct was "in the documentation. Early part of January." (ECF No. 303-1 at 105). He learned about the situation from Dr. Kramer only after he had reviewed the BD-15 slide created on January 13, 2015. (Coleman 07/24/24 Decl., Exh M; ECF No. 303-1). There are many reasons why counsel might have been consulted. Perhaps the company was concerned about a possible lawsuit by the patient, V.H., if there were a misdiagnosis. Perhaps it feared a complaint by the referring physician, Dr. Foley. It is also possible that legal counsel oversees all internal investigations, or at least those

18

involving its high level physicians. Even if Johnson were pulled into the investigation due to concerns that Plaintiff engaged in misconduct, that does not establish that a lawsuit by Plaintiff was reasonably foreseeable. It is Plaintiff's burden to establish that litigation was reasonably foreseeable, and he has failed to meet that burden.

Plaintiff therefore fails to establish the final two elements of *Bull* and, therefore, cannot establish spoliation.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Spoliation Sanctions is DENIED. Plaintiff has failed to establish that the evidence at issue – the BD-15 slide and block – actually existed as of January 7, 2015. If they did not exist, then they could not have been destroyed or altered on January 13, 2015. Even if Plaintiff could establish the existence of the BD-15 slide and block as of January 7, 2015, he failed to demonstrate that Defendant intentionally or in bad faith altered or destroyed this evidence for the purpose preventing them from being used in this litigation. Plaintiff also failed to prove that Defendant could have reasonably foreseen this litigation as of January 13, 2015. As such, Plaintiff's claims fail and Plaintiff's motion should be denied.

                                                  */s/ Stacey D. Adams*
                                                  Hon. Stacey D. Adams
                                                  United States Magistrate Judge

Dated: September 30, 2025