**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DR. MICHAEL B. MORGAN, *Plaintiff*, v. QUEST DIAGNOSTIC, INC, *Defendant*. | 20-cv-0430 (MEF)(SDA) **OPINION** |

**Table of Contents**


I. Background
  A. Facts
  B. Procedural History
II. The Law
III. Application
  A. Resignation
  B. Counterargument
IV. Next Steps


* * *

A company investigated one of its employees, a doctor, and mailed him a termination letter. But before he got the letter, the doctor emailed his supervisor to say he was resigning.

Later, the doctor sued --- claiming that his former employer had broken their employment contract by firing him.

The ex-employer now moves for summary judgment, arguing that the undisputed evidence is that the doctor was not fired, but rather that he quit.

But that argument does not work, because the evidence on it is disputed.

A separate argument from the ex-employer may or may not be persuasive. But fully assessing it requires more input from the parties.

* * *

## I. Background

### A. Facts

In January 2015, a lab[1] began investigating one of its employees, a doctor,[2] on suspicion that he had given a false diagnosis.[3]

As the month wore on, the investigation intensified.

On January 20, the lab sent an in-house investigator[4] to the doctor's workplace. See Defendant's 56.1 Statement ¶ 11; Plaintiff's 56.1 Response ¶ 11. The investigator questioned the doctor for around two hours. See Declaration of Ronald T. Coleman Jr., Esq. in Support of Motion for Summary Judgment ("Coleman Declaration"), Exhibit A ("Morgan Deposition") (ECF 326-3) at 163:10-164:2.[5]

And just after that, the doctor was suspended. He was made to collect his things, and was escorted out. See id. at 232:5-233:12.

That evening, the doctor spoke with his lawyers about what to do. See Defendant's 56.1 Statement ¶ 3; Plaintiff's 56.1

---

[1] Quest Diagnostics.

[2] Michael B. Morgan.

[3] See Quest Diagnostics Incorporated's Rule 56.1 Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("Defendant's 56.1 Statement") (ECF 326-2) ¶¶ 7, 9-12; Dr. Michael B. Morgan's Responses to Quest Diagnostics Incorporated Rule 56.1 Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("Plaintiff's 56.1 Response")(ECF 327-1) ¶¶ 7, 9-12.

[4] Kenneth Johnson.

[5] Unless otherwise noted, the Court relies on sources other than the parties' Local Rule 56.1 filings only for facts that are plainly undisputed. See Fed. R. Civ. P. 56(c)(1)-(3) (allowing this).

Response ¶ 3. One possible step that was discussed --- resigning. See Morgan Deposition at 182:1-13.

* * *

There was quiet for about a week. Then things moved quickly.

On January 27, the doctor's supervisor[6] called, and the doctor picked up. See Morgan Deposition at 175:21-176:21.

The doctor said he would not stay on the line without one of his lawyers on the call. The supervisor refused,[7] so everyone hung up, and "nothing of substance" was said by anyone. See Morgan Deposition at 176:14-22.[8]

That night, the doctor wrote an email, resigning from his job. See Coleman Declaration, Exhibit D ("Resignation Email") (ECF 326-3). The email went off at 8:00pm.[9]

As it turned out, some time that day the lab had put in the mail a hard-copy letter --- that said the doctor's "employment [was] being terminated for cause." Coleman Declaration, Exhibit G ("Termination Letter") (ECF 326-3); see also Defendant's 56.1 Statement ¶ 22; Plaintiff's 56.1 Response ¶ 22.[10]

A week or two later, the paper termination letter arrived at the doctor's house.[11]

---

6 Michael Kramer.

7 See Morgan Deposition at 176:3-7.

8 The description in the text of what happened on the call is contested. More later on that.

9 The next day, at 6:45am, the doctor emailed another copy. See Coleman Declaration, Exhibit E.

10 The decision to fire the doctor was made before he and the doctor had their phone call. See Plaintiff's Additional Statement of Materially Disputed Facts ("Plaintiff's 56.1 Statement") (ECF 327-2) ¶ 285; Quest Diagnostics Incorporated's Responses and Objections to Plaintiff's Additional Statements of Materially Disputed Facts ("Defendant's 56.1 Response") (ECF 328-1) ¶ 285; Coleman Declaration, Exhibit L ("Johnson Deposition") at 230:23-231:10.

11 Compare Defendant's 56.1 Statement ¶ 22 (stating that the doctor "did not receive [the letter] until several weeks" after it was mailed), and Plaintiff's 56.1 Response ¶ 22 (agreeing), with Morgan Deposition at 235:5-12 (testifying that the letter

* * *

For months after the above-described events, the doctor and the lab disagreed about what had happened.

Per the doctor, he had resigned --- based on the resignation letters he emailed in, which arrived well before he got the lab's hard-copy termination letter in the mail. See, e.g., Coleman Declaration, Exhibit H at 1.

Per the lab, the doctor had been fired --- on the January 27 phone call with his then-supervisor, which came before the doctor emailed in his resignation letter that night. See Declaration of Christopher Warren in Opposition to Quest's Motion for Summary Judgment, Exhibit 17 ("Board of Medicine Complaint") (ECF 332) at 3.

### B. Procedural History

Against the above backdrop, the doctor[12] sued the lab.[13]

In this lawsuit, the parties' positions have now flipped.

As for the doctor, who before maintained that he resigned --- he now says he was fired, and bases a breach-of-contract claim on that alleged firing.

For its part, the lab, which once asserted that the doctor was fired --- it now goes the opposite way. It contends that the doctor resigned, and it defends by pointing to that resignation.

* * *

From here, the doctor is called "the Plaintiff," and the lab is "the Defendant."

The gist of the Plaintiff's lawsuit: he had an employment contract with the Defendant, and the Defendant broke it by

---

was found at his house about seven or eight days after). These are small discrepancies. Nothing turns on them here.

[12] Recall: Michael B. Morgan.

[13] Recall: Quest Diagnostics.

firing him. See Second Amended Complaint ("Complaint") (ECF 77) ¶¶ 60-105.[14]

* * *

The Defendant has moved for summary judgment, arguing that the Plaintiff cannot win on this breach-of-contract claim --- mainly because the doctor resigned before he was fired. See Quest Diagnostics Incorporated's Memorandum of Law in Support of Motion for Summary Judgment ("Defendant's Brief") (ECF 326-1) at 1, 16-20.

The motion is now before the Court.[15]

* * *

Preview here the Court's approach.

Part II describes the governing legal principle. And Part III applies it to the facts of this case.

All of that adds up to this conclusion: there is a factual dispute here, and in the face of it a reasonable jury could find that the Defendant fired the Plaintiff --- so the Defendant is not entitled to summary judgment based on its argument that the Plaintiff resigned.

But that is not the end of the line.

The Defendant has another summary judgment argument --- and as to that argument, the record put before the Court is sparse. The parties will get a chance to supplement their filings before the Court rules. See Part IV.

## II. The Law

The parties agree that Florida law applies.[16]

---

[14] The Plaintiff's complaint includes an unjust enrichment claim. See Complaint ¶¶ 106-116. That has been dismissed. See Order (ECF 102).

[15] The everyday rules for evaluating summary judgment motions apply here. See, e.g., Gardner v. Township of Springfield, 2026 WL 3131563, at *4 n.25 (D.N.J. Oct. 20, 2026).

[16] They agreed before --- the Plaintiff's employment contract selects Florida law. See Coleman Declaration, Exhibit B at § 22. And they agree now, too. As to state law, the parties' papers rely just on Florida law. This makes sense --- the

In turn, the decisions of the Florida Supreme Court determine the content of Florida law. See Spence v. ESAB Grp., 623 F.3d 212, 216 (3d Cir. 2010). But the parties point to no directly on-point Florida Supreme Court case. And the Court has not found one.

So the Court must predict how the Florida Supreme Court would rule. See, e.g., Galvez v. Midland Credit Mgmt., ___ F. Supp. ___, 2026 WL 2240595, at *4 (D.N.J. 2026).

To make such a prediction, the decisions of state intermediate appellate courts are a key focus. See, e.g., Wayne Moving and Storage of N.J., Inc. v. School Dist., 625 F.3d 148, 154 (3d Cir. 2010). And so are the decisions of federal courts applying the state's law. See Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc., 653 F.3d 225, 231 (3d Cir. 2011).

Here, as noted, there is no on-point Florida Supreme Court case. But as will be seen in a moment, there are Florida intermediate appellate cases plus a federal case applying Florida law. These provide the basis for the Court to predict how the Florida Supreme Court would rule.

The Court's prediction: the Florida Supreme Court would hold that an employee who voluntarily quits his job cannot then sue his former employer for breach of the employment contract on the theory that he was fired.

* * *

To see this, work through the relevant cases.

Take, first, Lakatos v. Florida IPS, 2025 WL 1234010 (S.D. Fla. Apr. 29, 2025). There, a doctor sued his former employer, alleging that he was wrongly fired. But the doctor had signed a resignation letter, so the court only let his lawsuit go forward because the doctor alleged that his resignation had not been voluntary --- he had been forced to quit. See id. at *5-6.

Roughly the same fact pattern in Mullan v. Bishop of the Diocese of Orlando, 540 So. 2d 174 (Fla. Dist. Ct. App. 1989).

---

Plaintiff worked for the Defendant in Florida. See Defendant's 56.1 Statement ¶ 7; Plaintiff's 56.1 Response ¶ 7; cf. Chapman v. Salesforce, 817 F. Supp. 3d 226, 229 n.4 (D.N.J. 2026) (discussing possible limits on party-stipulated law).

In that case, a teacher was accused of hitting a student and told to quit or he would be fired. He quit, and then sued his former employer for breaching the parties' employment contract. See id. at 175-76.

As in Lakatos, though, the problem for the ex-employee in Mullan was that he had signed a resignation letter before he was fired. See id. at 176. And as in Lakatos, the Mullan court let the lawsuit go forward --- but only because the employer's quit-or-be-fired threat could have forced the employee to resign. See id. at 176-78. Therefore, the employee's resignation may not have been a voluntary-enough choice. See id.

In short, Lakatos and Mullan take it as a given that someone who freely quits his job cannot then turn around and sue his employer for breaking the employment contract by firing him.

Another Florida case relies on this same legal principle --- but surfaces it a bit more, and makes it explicit.

The case is Dantzler Lumber & Export Co. v. Defreitas, 544 So. 2d 1135 (Fla Dist. Ct. App. 1989). There, an employee signed a resignation letter, but nonetheless sued afterwards --- for breach of his employment contract. See id. at 1135.

In analyzing the issues, the Dantzler court spelled out the governing rule: "[g]enerally[,] an employee who elects to resign gives up his right to sue for breach of [the employment] contract," unless that resignation was involuntary. Id.

Call this the Dantzler rule. The Court predicts that the Florida Supreme Court would hold that the rule is an accurate statement of Florida law.

Two Florida intermediate-appellate courts (Mullan and Dantzler), one federal court applying Florida law (Lakatos), and nothing running the other way --- that is a solid basis for prediction. See Pim Brands, Inc. v. New Cibo Vita LLC, 806 F. Supp. 3d 480, 486-87 (D.N.J. 2025); 18W Holdings, Inc. v. Sing for Service, 763 F. Supp. 3d 651, 660-61 (D.N.J. 2025); Schulman v. Zoetis, Inc., 684 F. Supp. 3d 275, 279, 283 (D.N.J. 2023).

In the next Part, apply this prediction as to the content of Florida law to the facts of this case.

## III. Application

For a Florida breach-of-contract claim to get off the ground, a plaintiff must show three things: (1) a contract; (2) a material breach of that contract; and (3) damages. See Deauville Hotel Mgmt., v. Ward, 219 So. 3d 949, 953 (Fla. Dist. Ct. App. 2017).

In a case like this one, where a plaintiff-employee claims that element (2) is satisfied because his employer broke the employment contract by firing him --- the Dantzler rule[17] means that the plaintiff-employee's claim cannot work if the employee was not fired, but rather quit.

This is because the breach of contract invoked by the plaintiff (being fired) cannot count as a breach of contract (because by the time the plaintiff was assertedly fired, he was already gone --- he quit first).

What this adds up to: a defendant-employer is entitled to summary judgment on a Florida law breach of contract claim if the undisputed facts show that the plaintiff-employee voluntarily resigned before he was fired --- because, under Dantzler, such a plaintiff will not ultimately be able to make out his breach of contract claim.[18]

* * *

Given the above, the question for now is this: do the undisputed facts show the Plaintiff resigned before he was fired?

If yes, the Defendant is entitled to summary judgment. If no, the Defendant is not.

The Court's conclusion: no. The relevant facts are disputed. There is evidence that the Plaintiff resigned before he was fired. And there is evidence that runs the other way --- that suggests the Plaintiff was fired before he resigned.

The next sections explain.

---

[17] Recall: "Generally[,] an employee who [voluntarily] elects to resign gives up his right to sue for breach of [the employment] contract." Dantzler Lumber & Exp. Co., 544 So. 2d at 1135.

[18] See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case.").

**A. Resignation**

The stepping-off point here is the email that the Plaintiff sent to his supervisor on January 27.

> After considering my personal and professional circumstances over the weekend, I wish to tender my resignation as Medical Director Tampa, Pensacola, Atlanta Dermpath Diagnostics Quest effective immediately.
>
> Sincerely:
>
> M.B. Morgan, M.D.

Resignation Email at 1.

* * *

The email "tender[s]" the Plaintiff's "resignation." Then and there, "effective immediately." With no wiggle-room built in. No conditions, no hedge, no door left open just a crack. Nothing to muddy up the email's clear message.

The subject line of the Plaintiff's email read "Resignation Michael Morgan M.D." Resignation Email at 1. And that is what the email was.

* * *

Given the Plaintiff's resignation email, the Defendant has a straightforward argument.

The Plaintiff "elect[ed] to resign," Dantzler, 544 So. 2d at 1135, the argument goes. So he cannot satisfy one of the breach-of-contract elements that he must, because he quit before he was fired. Therefore, the Defendant is entitled to summary judgment. See Defendant's Brief at 16-20.

The Plaintiff, though, has a counterargument to this. And as set out in the next section --- it is persuasive.[19]

---

[19] The Plaintiff may have another counterargument --- that his resignation was not voluntary, because he felt pressured into resigning. Cf. Dr. Michael B. Morgan's Memorandum of Law in Opposition to Quest Diagnostic Inc.'s Motion for Summary Judgment (ECF 327) ("Plaintiff's Brief") at 30-31 (citing forced-resignation cases). After he was suspended on January 21, the argument seems to go, he "realize[d] that there were

some serious things happening." Morgan Deposition at 233:25-234:3. And a week later, when his supervisor called him on January 27, the Plaintiff sensed "something potentially ominous was about to occur," that the call was of a "serious nature," probably even "termination." Morgan Deposition at 176:2-3, 177:6-8. Stresses and strains like this may matter --- because under Florida law, a resignation cuts off a claim for being fired only if the resignation was voluntary. And pressure heaped on an employee can certainly make it harder for him to make a free choice. But note that the standard set by Florida law in this area is high. In City of Miami v. Kory, the court held that a resignation was not involuntary --- even where an employee was told she would be fired in an hour, and then offered her resignation just under the 60-minute wire. 394 So. 2d 494, 496-98 (Fla. Dist. Ct. App. 1981). Against this, the Plaintiff mainly argues by analogy --- contending that voluntariness is not the only standard, that the governing set-aside-a-resignation standards should be imported from assertedly analogous areas of law. From federal anti-discrimination law. See Plaintiff's Brief 23-28. And from Florida unemployment-benefit law. See id. at 31. Are these analogies tight enough to reason from? Does the Plaintiff get the content of anti-discrimination law and unemployment-benefit law right? Maybe and maybe. The Court expresses no opinion --- in part because before getting to any of that, the first question would be more basic. Namely, does it make sense to reason by analogy at all. Going that route works when it is not clear what the rule is, when there is a gap in the fabric of the law. See The Atlas, 93 U.S. 302, 315-17 (1876); 4SIGHT Supply Chain Grp. v. Gulitus, 730 F. Supp. 3d 127, 132 (D.N.J. 2024). But given Kory, is there any relevant gap in Florida breach-of-contract law? And note that this Court has to apply Florida law as it is --- not to shift its meaning, by analogy or otherwise. See Caserta v. GEICO Gen. Ins. Co., 507 Fed. App'x 104, 107 (3d Cir. 2012); Paramount Residential Mortg. Grp. v. Nationwide Mortg. Bankers, Inc., 2024 WL 2764821, at *5 (D.N.J. May 30, 2024). (Kory, to be sure, was not a breach of contract case. But Florida courts have routinely applied it in such cases. See Mullan, 540 So. 2d at 176-178; Dantzler, 544 So. 2d at 1135-36.) One way or another, the issues raised in this footnote can be bracketed. They do not need to be taken up, at least for now, given the

### B. Counterargument

Under Florida law, if an employee voluntarily resigns from a job, he cannot turn around later and sue for breach of contract on the theory that he was fired from the job. A person who is no longer in a job (because he resigned) cannot contend that he was fired from the job. See Part II.

But the logic of this does not work if the person was fired before he resigned. Because in that case, the employee was in the job when he was fired from it.

Here, there is evidence on both sides of the coin. Evidence that the Plaintiff was not fired before he resigned. And evidence that he was fired before he resigned.

That is a dispute as to a material fact --- of a kind that makes summary judgment impossible.

* * *

The Plaintiff plainly resigned by email on the night of January 27. The only candidate for his being fired before the email was the Plaintiff's earlier-that-day call with his supervisor.[20]

There is ample evidence that the Plaintiff was not fired on the call. Indeed, that evidence comes from the Plaintiff.

At his deposition, he offered three relevant pieces of testimony.

First, agreeing that "nothing of substance" was said on the phone call. See Morgan Deposition at 176:18-22. Being fired --- that would very much be something "of substance."

Second, this:

> [The Defendant's lawyer]: So, do you deny that they informed you that [the Defendant] intended to terminate your employment in this phone call?
>
> [The Plaintiff]: It was not discussed in the phone call.

---

Court's assessment of the Plaintiff's other counterargument, taken up below in Part III.B.

[20] Because from the time he was suspended and went home to the time he sent out his resignation email the phone call was the only interaction he had with anyone working for the Defendant.

Id. at 176:14-17.

And third:

> [The Defendant's lawyer]: It is your position now that you tendered your full resignation prior to receiving any notice of termination from [the Defendant], right?
>
> [The Plaintiff]: Yes[.][21]

Id. at 249:24-250:3.

* * *

As set out above, there are at least three pieces of evidence that the Plaintiff was not fired on the January 27 call, the one before he sent in his night-of-January 27 email.[22]

---

[21] A "but" followed the "yes." Morgan Deposition at 250:3. But all the Plaintiff went on to explain was that "it would seem with the recent revelations here that it was a case of alea iacta est. The die was cast, as it were, in the days prior to the 27th. If you look at, I guess, the internal memos, the decision was made prior to that." Id. at 250:6-11. This does not purport to shed light on what happened during the phone call. The call happened in 2015. See Part I.A. But the Plaintiff's above-mentioned "revelations" were "recent" --- apparently dating from when the deposition was taken in 2023. And the reference to "internal memos" almost surely refers to the Defendant's internal decision-making materials that the Plaintiff saw in discovery --- which showed that a decision had been made to fire the Plaintiff before the call, see footnote 10 --- a decision that, per the Plaintiff, he was not made aware of on the call.

[22] In this litigation, the Plaintiff has tried to walk back his testimony --- principally by accusing the Defendant of "omit[ting] a portion of [the Plaintiff's] deposition transcript, wherein he acknowledged his conversation with [the Defendant's] representatives was explicit enough that he concluded that [the Defendant] was terminating him." Plaintiff's 56.1 Response ¶ 2. But this makes little sense. The Defendant attached all of the substantive parts of the transcript of the Plaintiff's deposition. Some of the opening lines were left out. But no pages skipped after that. Moreover, if "a portion" of his deposition was not cited, why

But other evidence is 180 degrees away from that --- proof that the Plaintiff was fired on the January 27 call.

After the Plaintiff's employment ended, the Defendant put in a complaint about the Plaintiff to a Florida medical regulator. It included this:

> On 1/27/2015, [the Defendant] verbally notified [the Plaintiff] it was terminating his employment for cause, and sent him written notice of this decision by overnight mail the same day. After [the Defendant] terminated him, [the Plaintiff] purported to submit his resignation.

Board of Medicine Complaint at 3.

Context makes clear that the January 27 "verbal notification" took place during the relevant phone call. And the last sentence of the above cinches things. Per the Defendant, the firing took place before the resignation. "After [the Defendant] terminated him, [the Plaintiff] purported to submit his resignation."[23]

* * *

The upshot: the Defendant is not entitled to summary judgment on the argument that the Plaintiff resigned before he was fired because there is a factual dispute on that point.

---

could the Plaintiff not simply have provided the relevant parts to the Court? And note: in light of the Plaintiff's sharp accusation, the Court reviewed each of the 300+ pages of the transcript of the Plaintiff's deposition. There is nothing there that casts doubt on the Plaintiff's testimony that he was not fired during the phone call.

[23] It is hard to see how the cited statements would not be admissible at a trial, when offered by the Plaintiff against the Defendant. See Fed. R. Evid. 801(d)(2)(C) (allowing admission of out-of-court statement to be "offered against an opposing party," provided --- as seems to be the case here --- the statement is "made by a person whom the party authorized to make a statement on the subject"). And note that while personal knowledge is generally required, see Fed. R. Evid. 602, that is not the case in this context. See Mara v. Phila. Hous. Auth., 497 F.3d 286, 299 n.9 (3d Cir. 2007).

A reasonable jury could choose to credit the Plaintiff's deposition testimony, which suggests there was no pre-resignation firing. Or a reasonable jury could choose to credit the Defendant's complaint to the regulator, which suggests there was a pre-resignation firing.

And that means[24] the issue is one "for a jury to consider --- not for the Court to take away, by granting summary judgment." Specht v. Suarez, 798 F. Supp. 3d 485, 502 (D.N.J. 2025).

## IV. Next Steps

The Defendant's first argument for summary judgment does not work. See Part III.B.

But the Defendant has another argument. The Plaintiff's employment contract said that he could be fired for cause, and, the argument goes, the Defendant had cause to fire him. So firing the Plaintiff --- if that is what happened --- is no breach of contract. See Defendant's Brief at 20-29.

For now, though, it is difficult to assess this argument.

The Plaintiff was fired after an internal investigation that suggested he made a wrong diagnosis. See Coleman Declaration, Exhibit M ("Report") (ECF 326-3) at 2.

And the parties' employment contract seems to open the way for firing a doctor based on at least some diagnostic errors. See Coleman Declaration, Exhibit B at § 14(a)(18) (including, as a ground for termination, that the Plaintiff's continued employment "would pose an unreasonable risk of harm to patients").

But this does not seem to be why the Plaintiff was in fact fired. Indeed, the investigator who put together the internal report has testified that making a mistake is not generally a firing offense. See Coleman Declaration, Exhibit L ("Johnson Deposition") at 82:15-20.

Why the firing, then? It seems to be that the Plaintiff's asserted diagnostic error was taken as no mere error --- as "intentional." See Report at 2; see also Johnson Deposition at 69:21-70:3.

---

[24] Unless there is another basis for granting summary judgment.

But it is not clear from the legal papers what the basis for this conclusion was.[25]

Maybe there was direct or circumstantial evidence of intentional conduct. Or maybe the Plaintiff's alleged diagnostic error was so severe that it must have been intentional[26] --- on the theory that there are some "errors" that a competent person would never make except purposely.

The Court can work things through based on the papers as they are. But the wiser course is to permit supplemental filings --- that elaborate on the relevant arguments, and back them up with highly-targeted attachments that in turn include the specific factual information that was obtained through the discovery and that the party in question is relying on.

An order will issue today as to this.

* * *

On this 4th day of November, 2026.

Michael E. Farbiarz, U.S.D.J.

[25] Combined, the exhibits to the parties' declarations run to over 3000 pages. The Court will not work through these. Rather, it will look to the precise pieces of the factual record that the parties affirmatively bring to the Court's attention.

[26] In which case, note that the Court has little ability to differentiate, without a factual basis supplied by the parties, between a severe diagnostic error in this context and a more ordinary one.